UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

LINDA M. FORBES,

                Plaintiff,

      v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

Case No. 6:13-cv-01174-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Linda M. Forbes ("Forbes"), seeks judicial review of the final decision by

the Social Security Commissioner ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC

§§ 401-33. This court has jurisdiction to review the Commissioner's decision pursuant to

42 USC § 405(g) and § 1383(c)(3). For the reasons set forth below, that decision should be

reversed and remanded for an award of benefits.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Forbes protectively filed for DIB on July 26, 2011, alleging a disability onset date of January 14, 2011.  Tr. 160-63.[1]  Her application was denied initially and on reconsideration. Tr. 111-15, 117-22.  On November 8, 2012, a hearing was held before Administrative Law Judge ("ALJ") Ted W. Neiswanger, at which Forbes and a Vocational Expert ("VE") testified.  Tr. 27-82.  The ALJ issued a decision on February 12, 2013, finding Forbes not disabled.  Tr. 12-22.  The Appeals Council denied a request for review on May 10, 2013. Tr. 1-3.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 422.210.

## BACKGROUND

Born in 1958, Forbes was 54 years old at the time of the hearing before the ALJ. Tr. 160.  She completed high school, two years of college, a medical transcriptionist certification, and has worked as a front office receptionist.  Tr. 22, 37, 176.  Forbes alleges she stopped working on January 14, 2011, due to the combined impairments of degenerative disc disease, fibromyalgia, and depression.  Tr. 161, 175.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999); 20 CFR § 404.1520.

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on December 17, 2013 (docket #11).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR § 404.1520(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 404.1520(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show

3 - FINDINGS AND RECOMMENDATION

that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(v) & (g).

## ALJ'S FINDINGS

The ALJ noted initially that Forbes had met the insured status requirements through December 31, 2015. Tr. 17. At step one, the ALJ concluded that Forbes has not engaged in substantial gainful activity since January 14, 2011, the alleged onset date. *Id*.

At step two, the ALJ determined that Forbes has the severe impairments of degenerative disc disease of the lumbar spine with lumbago and probable fibromyalgia but her depression was non-severe. *Id*.

At step three, the ALJ concluded that Forbes does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 18. The ALJ found that Forbes has the RFC to perform sedentary work, "except she can only lift or carry 10 pounds occasionally and frequently . . . stand/walk for about two hours and sit for about six hours in an eight-hour workday." *Id*. She also "needs freedom to shift positions between sitting and standing to manage her pain after 15 to 20 minutes" and "freedom to use a heating pad to help manage her pain." *Id*. In addition, "[d]ue to periodic difficulty with concentration due to pain, she is restricted to SVP 4 level semiskilled work tasks." *Id*.

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Forbes's RFC did not preclude her from returning to her past relevant work as a receptionist. Tr. 22. Therefore, the ALJ did not make a finding at step five.

Accordingly, the ALJ determined that Forbes was not disabled at any time through the date of the decision. *Id.*

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## FACTUAL AND MEDICAL BACKGROUND

In 1978 at age 19, Forbes was diagnosed with a herniated disc from a work injury.  Tr. 52-53.  In 1984, she underwent a L4-5 laminectomy to relieve the pressure in her spine from the herniation.  Tr. 54, 308-09, 388.  The surgery mitigated the shooting pain in her leg, but she continued to have chronic right-sided lumbar back pain.  Tr. 54-55, 308, 453.

On September 13, 2001, Forbes was involved in a motor vehicle accident and was treated the same day for left-sided lumbar back pain.  Tr. 453.  Although she received physical therapy through July 2002, she continued to report pain.  Tr. 307-08.

On January 5, 2004, Forbes established care with John Ward, M.D., at the clinic where she worked as a medical receptionist. Tr. 59, 297, 336, 450. Her back pain was unchanged, and Dr. Ward continued her prescription of Vicodin. Tr. 451. On September 16, 2005, Forbes reported to Dr. Ward that the pain made work difficult at times and limited her activities. Tr. 446.

On November 9, 2005, Craig D. McNabb, M.D., evaluated Forbes for low back and accompanying upper leg pain that "occurs every 3 or 4 years." Tr. 309. Dr. McNabb observed significant back discomfort with some sciatic symptoms and ordered X-rays of her lumbar spine. Tr. 310. Those X-rays showed "degenerative changes at L4-5 and L5-S1 with slight anterolisthesis of L5" and minimal lumbar scoliosis. Tr. 445.

On March 24, 2009, Forbes reported to Dr. Ward increasing low back pain that Vicodin was not relieving. Tr. 362. Dr. Ward opined that that the pain was "limiting her activities more and more," diagnosed lumbago (low back pain), and prescribed Percocet. Tr. 363.

On April 24, 2009, the pain had spread to Forbes's left hip. Tr. 360. She had been exercising since January, but the pain had increased in the past few months. *Id.* Dr. Ward observed that Forbes had full range of motion but was sensitive to palpation. *Id.*

On August 27, 2009, Dr. Ward discussed with Forbes the results of a recent MRI that showed a "disc bulge at L4-5 associated with severe degenerative disk disease," "anular fibers compatible with an anular tear or fissure," and "a mild anular bulge at L3-4." Tr. 333, 391 (MRI). Dr. Ward referred her to a neurosurgeon, Todd J. Lewis, M.D., to discuss surgical intervention. *Id.*

On September 21, 2009, Dr. Lewis examined Forbes. Tr. 358-73. Forbes reported a more than 12-year history of low back pain radiating down both legs, but denied depression,

anxiety, or memory loss.  Tr. 371.  Dr. Lewis ordered a MRI of the lumbar spine that showed "severe L4-5 spondylosis."  Tr. 372.  Dr. Lewis's examination confirmed "fibromyalgia along [with] degeneration at L4-5," but found Forbes "neurologically intact."  Tr. 373.  He prescribed bilateral, L4-5 epidural injections, a "good self-directed home exercise program," and rehabilitation for her fibromyalgia.  *Id.*

On September 24, 2009, Forbes returned to Dr. Ward who had received Dr. Lewis's report that surgery was not an option for her back pain.  Tr. 356.  Dr. Ward opined that it was important to get Forbes's depression "better controlled," noting that she had "not been consistent with taking her Prozac," and added Fluoxetine.  *Id.*

On January 8, 2010, Forbes complained that her medication was not as effective as in the past.  Tr. 349.  Noting that physical therapy and acupuncture had not been successful treatments and that "increasing dose of narcotics will not contribute much more to pain control," Dr. Ward referred Forbes for "possible injections."  Tr. 350.  Dr. Ward also discussed "the possibility of fibromyalgia" and started Cymbalta.  *Id.*

In early 2010, Jaimy T. Patton, M.D., treated Forbes's back pain with bilateral sacroiliac joint injections.  Tr. 385, 388.  Forbes reported pain relief for two months following the first injections.  Tr. 388.

On January 7, 2011, Forbes reported that she was in pain "all the time," "having trouble getting through work," "not sleeping very well," "making some mistakes at work," and "feeling really distracted."  Tr. 339.  Dr. Ward assessed that the pain was increasingly limiting and seemed to be progressing, noted she had "tried multiple modalities and medications with only limited success" and felt "like working significantly exacerbates her pain," and recommended that she apply for short-term disability.  Tr. 340.

7 - FINDINGS AND RECOMMENDATION

On February 7, 2011, after foot surgery in late December 2010, Forbes was on leave from work. She reported to Dr. Ward that she felt "more positive mentally" and was "thinking better" because she was able to rest when she needed and stretched consistently. Tr. 336-37. Dr. Ward opined that she should continue to not work. Tr. 337.

On April 7, 2011, Forbes told Dr. Ward that her attempt to reduce her intake of Percocet only increased her pain and that she did not feel that she could return to work. Tr. 329. Dr. Ward agreed. Tr. 330.

On August 4, 2011, Forbes reported to Dr. Ward that "even when she goes to the grocery store she has trouble getting around" and "at maximum she can walk 2 or 3 blocks without having to rest" and sit for "10 or 15 minutes." Tr. 423. Dr. Ward noted that "multiple medications, acupuncture, PT [physical therapy], osteopathic manipulation, massage therapy and lumbar injections with anesthesia" had not improved her symptoms. Tr. 424.

On September 12, 2011, Forbes told Dr. Ward she had been denied long-term disability due to the absence of documentation. Tr. 421. She was unable to sit still through the treatment session. Tr. 422. Dr. Ward opined:

> At this point, it does not appear that she is able to even do sedentary activities. . . . Patient [is] unable to sit more than 10 minutes without developing pain. . . . At this point, I don't know what more that I can do documentation wise to outline her inability to work. At this point, the disability question seems to be more a legal [than] a medical issue. We discussed the fact that many of her symptoms are not necessarily reinforced with the physical exam. Nevertheless, she continues to have pain.

*Id*.

Although Forbes reported on February 20, 2012, that her medication levels were not sufficient, Dr. Ward concluded that increasing her dosage would only have "diminishing returns." Tr. 461. Instead, he recommended updated imaging and a formal functional capacity

exam because his "level of expertise as a primary care physician" prevented him from making "more objective findings to document and confirm her pain complaints," but acknowledged that Forbes did not have insurance. *Id.*

Contrary to his September 12, 2011 opinion, Dr. Ward wrote in letters dated April 23, 2012 (Tr. 463-67) and May 29, 2012 (Tr. 470), that Forbes is incapable of light work but capable of the full range of sedentary work. Tr. 463-67. Regarding her ability to do sedentary work, he explained:

> The issue is that it has been years since we have performed any objective testing or obtained further consultation. Therefore, I do not have any objective evidence to explain why she cannot do sedentary work. I do not feel it is accurate to make these determinations based only on her subjective symptoms.
>
> As a primary care physician, I am not in a position to answer the specific questions without her undergoing further evaluation.

Tr. 470.

On June 1, 2012, at Dr. Ward's referral, Laura Rung, M.D., performed a consultative examination. Tr. 475, 477. She found Forbes was positive for 12 out of 18 fibromyalgia points, with lumbar spine flexion limited to 20 degrees and extension to 10 degrees. Tr. 479. Dr. Rung assessed "chronic low back pain limiting physical function, particularly ability to pursue gainful employment," "probable fibromyalgia, most likely secondary to chronic pain," and "severe to extreme depression." Tr. 480. She opined that:

> Under ideal circumstances, it is likely that [Forbes] would be employable within the limits of maximum sit 15-30 minutes at one time, maximum stand 10-20 minutes at one time, maximum walk 10 minutes at one time, and maximum lift 8-10 pounds rarely. She would require an ergonomic sit/stand workstation and ability to use heating pad on her back as needed. She would also require addition of non-cognitively impairing pain management techniques such as massage, acupuncture, aquatic exercise, physical therapy, and counseling for depression and to teach pain management techniques. She would be a candidate for epidural

9 - FINDINGS AND RECOMMENDATION

> steroid injections.  If these were no help, consideration of L4-5 fusion surgery or
> an implant nerve stimulator would be reasonable.

*Id.*

Forbes returned to Dr. Rung on March 19, 2013, reporting that her "feelings of

discouragement and wishing she were dead ha[d] not changed but that uncontrollable weeping

ha[d] diminished."  Tr. 485.

## FINDINGS

Forbes contends that the ALJ erred by improperly rejecting her testimony and the

opinion of Dr. Rung and by treating her depression as a non-severe impairment at step two.

### I.    Forbes's Credibility

The ALJ found Forbes "not entirely credible" regarding the severity of her

impairments.  Tr. 19.  Although concluding that her degenerative disc disease and probable

fibromyalgia "are likely to cause limiting pain," he found that "the veridical limitations

shown by the documentary evidence are not as severe as she alleges."  *Id.*  Forbes

challenges the ALJ's failure to credit her testimony that her pain is so severe that she cannot

work.

### A.    Legal Standards

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing

court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."

*Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341,

345-46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is

insufficient.  The ALJ "must state which [subjective symptom] testimony is not credible and

what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d 915,

918 (9th Cir 1993).  The ALJ may additionally employ ordinary techniques of credibility

evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence."  20 CFR § 404.1529(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). This standard "is the most demanding required in Social Security cases."  *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F3d 920, 924 (9th Cir 2002).

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid.  *Tommasetti*, 533 F3d at 1040.  Inconsistencies in a claimant's testimony, including those between the medical evidence and the alleged symptoms, can serve as a clear and convincing reason for discrediting such testimony.  *Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 599 (9th Cir 1999).

Credibility determinations are within the province of the ALJ.  *Fair v. Bowen*, 885 F2d 597, 604 (9th Cir 1989), citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, the role of the reviewing court is not to second-guess that decision.  *Id.*

### B.    <u>Testimony</u>

Forbes's primary complaint is low back and shooting leg pain, irritated by increased activity and standing or sitting for extended periods.  Tr. 48, 67.  To relieve the pain, she takes seven Percocet per day and lies down with her feet up and a heating pad on her back for 15-20 minutes every hour to hour and a half.  Tr. 49-51, 60-61.  On her better days, Forbes only lies down every three hours.  Tr. 63.  On her worst days, she cannot get out of her pajamas, which happens one to two days per week.  Tr. 63-64.  Her fibromyalgia causes burning, especially in her feet, and pain, although she cannot differentiate between back and fibromyalgia pain.  Tr. 51-52, 67-68.

At the time Forbes left her medical receptionist job in January 2011, her position required checking-out patients, scheduling follow-up appointments, making phone calls, and printing fee slips.  Tr. 43.  She worked at a sit-stand station that allowed her to alternate between sitting and standing.  Tr.  64.  She also took breaks from sitting by delivering messages to nurses on foot.  *Id.*  She used a heating pad at her desk, but was forced to stop after her coworker tripped over the electrical cord.  Tr. 65.  During the last two months of her job, Forbes made mistakes because her pain medication makes her forgetful.  Tr. 69.  Forbes once mistakenly erased all appointments for one doctor, and another time entered incorrect patient payment information.  Tr. 57-59.

At the time of the hearing she worked part-time at her brother's auto shop, running errands, answering phones, and accepting deliveries.  Tr. 65.  She used her heating pad at the shop, took breaks to rest whenever she needed, and could skip work entirely without consequences.  Tr. 65-66.

///

12 - FINDINGS AND RECOMMENDATION

C.    <u>Analysis</u>

One reason given by the ALJ for finding Forbes partially credible was inconsistency between her testified limitations and the daily activities reported on her Function Report. Tr. 21, citing Tr. 193-200.  The ALJ indicated that Forbes reported "little difficulty managing her own personal care," "prepare[s] her own meals," "performs household chores," "washes dishes and does her laundry," and "goes grocery shopping in stores about every week." Tr. 21.  Forbes argues that the ALJ overstated her daily activities because she can only cook simple meals requiring at most 10-20 minute preparation (Tr. 195), cleans for only 10-15 minutes a day (Tr. 196), needs help with laundry and changing sheets on her bed (*id*), and spends at most 15-20 minutes grocery shopping.  *Id.*  Because Forbes did not testify to total incapacity, her account of her daily activities is not inconsistent with her testimony of debilitating pain and is consistent with the ALJ's RFC of sedentary work. Each of Forbes's daily activities took less than 30 minutes to complete which would have allowed her time to lie down every hour for 15-20 minutes as she testified.  Without identifying an actual inconsistency in Forbes's testimony, this reason cannot form a legitimate basis to discredit it.

The ALJ also cited Forbes's "resistance to vocational rehabilitation" as a reason for discrediting her testimony.  Tr. 21.  The ALJ indicated Forbes had "missed appointments" with her vocational counselor, "thus delaying her [progress] to make a viable vocational goal decision."  *Id* (alteration in original).  Evidence of a claimant's lack of propensity to work negatively affects credibility regarding inability to work.  *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002).  However, Forbes's missed appointment did not indicate a disinterest in employment.  The ALJ correctly quoted the counselor's statement from

October 18, 2012 (Tr. 291) that Forbes missed multiple appointments, but the record shows

she missed only one appointment because she recorded the wrong date and that the

appointment was rescheduled.  Tr. 294-95.[2]  Her documented trouble with memory retention

caused by her medication certainly could justify this error.  Furthermore, her counselor

documented her interest in employment as an independent transcriptionist (Tr. 296), in

exploring new vocations (Tr. 292, 294), and developing a vocational rehabilitation plan.

Tr. 291.  The vocational testing report states that she "arrived on time for her scheduled

appointment. . . . was appropriately dressed and groomed for a work shop setting [and] was

cooperative and appeared to put forth her best effort on all assigned tasks."  Tr. 234.  This

reasoning provides no legitimate basis on which to discredit Forbes's testimony.

The ALJ's primary reason for discrediting Forbes's testimony was the lack of

objective medical evidence to show "there has been a worsening in her condition that made

her unable to perform her job duties as a receptionist."  Tr. 20.  He noted that Forbes quit

her job only "because she could no longer use a heating pad" and that she demonstrated

"good reflexes, good strength and normal gait," despite consistent pain complaints.  *Id*.

That reasons is not supported by substantial evidence in the record.

Generally, an ALJ may not discredit the claimant's testimony as to the severity of

symptoms merely because they are unsupported by objective medical evidence.  *Reddick*,

157 F3d at 722.  Here the record contains supporting objective medical evidence for

Forbes's back pain.  The 2009 MRI showed severe degenerative disc disease at L4-5 with an

annular tear or fissure and a disc bulge.  Tr. 391.  In addition, fibromyalgia testing

consistently revealed symptoms as early as September 2009 (Tr. 373) and as recently as

---

[2] Another appointment on May 8, 2012, was rescheduled due to her counselor's absence.  Tr. 298.

14 - FINDINGS AND RECOMMENDATION

June 2012.  Tr. 479-80.  In the Ninth Circuit, an ALJ cannot require objective evidence for a

disease such as fibromyalgia that "eludes such measurement" and that "is diagnosed entirely

on the basis of patients' reports of pain and other symptoms."  *Benecke v. Barnhart*, 379

F3d 587, 590, 594 (9th Cir 2004).

Instead, the issue is whether, as found by the ALJ, objective medical evidence fails

to support Forbes's inability to work at her past job as a receptionist.  The circumstances

surrounding the end of Forbes's job are unclear.  At the hearing, Forbes cited Dr. Ward as

the catalyst for leaving.  When she told Dr. Ward about her mistakes,

> his eyes got real big — because I'm working for him, . . . And so, he
> says, "Well, we don't want you getting fired."  And so he says, "Do
> you think it's time we talk about, you know, your disability?"  And I
> said, yes.  So it was kind of his urging, you know?

Tr. 59-60.

However, Forbes told her vocational counselor that she:

> resigned her job when she decided her physical health decline[d] to
> where she could . . . no longer perform her duties. . . .  She was
> frustrated about her decision to resign[] otherwise she would have
> stayed at her last job. . . .  [H]er [primary care physician] observed
> increased errors in her work performance due to the severe mobility
> pain, and medication affecting her memory and concentration.  She is
> disappointed that her [primary care physician] no longer support[s] her
> reasons for resigning.

Tr. 297.

Most recently, Forbes told Dr. Rung that she was fired when her mistakes did

not improve after returning from medical leave:

> Patient reports that some time in 2010 her job requirements changed so
> that she was required to move from one workstation to another.  This
> made it impossible for her to use her ergonomic sit/stand work station
> and the electric heating pad she used daily for pain control.  She began
> making serious cognitive errors.  1 day inadvertently canceling an
> entire day of physician appointments.  Another day, entering a 4 digit

> ID number instead of a monetary amount, which had significant consequences.  She was put on medical leave but when returned there is no improvement and was let go from work because of her inability to perform [the] job duties in January 2011.

Tr. 477.

These latter two reports are consistent with Forbes's testimony at the hearing that she began making serious mistakes during the last two months of her job (Tr. 57-59).  Whether those mistakes caused Forbes to resign (Tr. 297) or be "let go" (Tr. 477), they precluded her from performing her job by January 2011.[3]

Substantial objective medical evidence reveals that Forbes's mistakes were secondary to her chronic pain and inability to concentrate because she could no longer use a heating pad or sit/stand workstation.  Dr. Ward increasingly opined that Forbes's pain was progressing (Tr. 340, 363), that her job exacerbated her pain (Tr. 340), and she could not return to work.  Tr. 329, 423.  Dr. Rung specifically concluded that Forbes required use of a heating pad and ergonomic sit/stand workstation to return to work.  Tr. 480.  Although the ALJ rejected that portion of Dr. Rung's opinion regarding Forbes's need for a sit/stand station, he did not specifically reject Forbes's testimony that she could perform her past job only when using the "sit/stand station" (Tr. 64) and credited her testimony about her need for a heating pad.  Tr. 20.  In other words, even if the ALJ correctly concluded that objective medical evidence did not support "a worsening in her condition" that made Forbes unable to perform her past job, that conclusion does not discredit Forbes's

---

[3] Performance reports during the period from June 2000 to January 2010 consistently indicate that Forbes was meeting the standards of her job.  Tr. 236-88.  Although Forbes's attorney told the ALJ he would request performance evaluations through the date of her termination, none appears in the record.  Tr. 33-34.

16 - FINDINGS AND RECOMMENDATION

testimony that she could not perform her past job due to the lack of necessary accommodations.

In sum, the ALJ failed to give clear and convincing reasons supported by substantial evidence to discredit Forbes's testimony.

## II.    **Dr. Rung's Opinion**

The ALJ assigned "some weight" to the opinion of Dr. Rung, adopting the majority of her opinion as "largely consistent with the objective medical evidence." Tr. 21. However, he noted that "some of the limitations provided by Dr. Rung were based on [Forbes's] self-described difficulties with her last work experience." *Id.* Although he "largely included the limitations reported by Dr. Rung" in the RFC, he "discounted" her opinion that Forbes "can only work if she is accommodated with a special ergonomic workstation," explaining:

> This limitation was based on [Forbes's] report that she left her last job because the employer needed her to work at multiple workstations where she was unable to use her heating pad. It is speculation to assume [Forbes] is unable to work at any job where the employer is unwilling to purchase an expensive specialized ergonomic workstation.

*Id.*

An uncontroverted treating or examining physician's opinion may only be discredited for "clear and convincing reasons." *Thomas*, 278 F3d at 957 (citation omitted). If it is contradicted by the opinion of another doctor, the ALJ may reject the treating or examining physician's opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted).

Dr. Rung was an examining physician.  To some extent, Dr. Rung's opinion was contradicted by Dr. Ward who opined that Forbes could perform the full range of sedentary work without restrictions. Tr. 463-67.  The ALJ gave "great weight" to Dr. Ward's opinion, but "largely included" Dr. Rung's additional restrictions in the RFC and specifically rejected only her recommendation for the ergonomic workstation.  Thus, the ALJ was required to give specific and legitimate reasons to reject that portion of her opinion.

Dr. Rung thoroughly examined Forbes, conducted tests, and reviewed imaging of Forbes's lumbar spine before diagnosing fibromyalgia, chronic low back pain, and depression, but her specifications for a recommended work environment were based entirely on Forbes's description of her old work setting.  "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F3d 1035, 1041 (9th Cir 2008).  However, as explained above, the ALJ improperly discounted Forbes's testimony.  Moreover, the ALJ did not specifically reject Forbes's testimony that she could perform her past job when using the "sit/stand station" and a heating pad.  Tr. 20.

Dr. Rung's recommendation is consistent with the RFC requirement that Forbes have the flexibility to shift positions between sitting and standing.  Yet the ALJ simply assumed that the ergonomic sit/stand workstation recommended by Dr. Rung is so "expensive" and "specialized" that no employer would be willing to purchase it.  The VE testified that a "sit-stand option with the ergonomically designed workstation" would be accommodated "in some instances," but did not specify how many such instances.  Tr. 77.  The record does not reveal whether an ergonomic workstation, which most employers are unlikely to provide employees, is synonymous with the workstation Forbes used at her old job and described to

18 - FINDINGS AND RECOMMENDATION

Dr. Rung.  Dr. Rung was the only one to characterize the sit/stand station as ergonomic.

Neither the ALJ nor the VE explored whether non-ergonomic, or perhaps more available,

ergonomic equipment could accommodate Forbes.

Furthermore, the ALJ mischaracterized Dr. Rung's opinion as stating that Forbes

"can only work if she is accommodated with a special ergonomic workstation."  Tr. 21.

Although Dr. Rung opined that Forbes "would require an ergonomic sit/stand workstation

and ability to use heating pad on her back as needed," she did not state that Forbes was

unemployable for that reason.  Tr. 480.  Instead, she stated that Forbes "likely . . . would be

employable within" her physical limitations and recommended that Forbes "initiate

vocational rehabilitation," adding:  "It is doubtful that there is any employment reasonably

available within the above limitations and I suspect that the vocational specialists are likely

to declare her unemployable."  *Id*.  Accordingly, Forbes pursued vocational rehabilitation

from April through November 2012.  Tr. 231-304.  In the final vocational rehabilitation

report dated November 8, 2012, the evaluator was unable to "make any vocational

recommendations" because Forbes's "reported constant chronic pain which reportedly

increases with any and all increased activity as well as her inability to focus or concentrate

is not commensurate with competitive employment."  Tr. 235.  Thus, no substantial

evidence in the record supports the ALJ's characterization of Dr. Rung's opinion regarding

an ergonomic workstation as "speculation."

## III.  **Depression**

Forbes also challenges the ALJ's consideration of her diagnosis of depression as

non-severe, despite "some mention" of the condition in her medical record, because she

neither sought nor received treatment for depression and had not been diagnosed with

19 - FINDINGS AND RECOMMENDATION

depression by a mental health specialist.  Tr. 17.  The ALJ also noted that although
Dr. Rung reported depression, she mentioned that Forbes's musculoskeletal pain could have
skewed the results of the depression questionnaire.  *Id.*  Finally, the ALJ asserted that
neither Forbes nor the Third Party Function Report from her mother alleges any mental
health issue other than concentration difficulties.  *Id.*

Dr. Ward began treating Forbes for depression as early as July 2007 (Tr. 442), but
did not prescribe anti-depressants until September 2009, first Fluoxetine (Tr. 357) and then
Cymbalta in January 2010.  Tr. 350.  There is no record in Dr. Ward's treating history to
explain why the diagnosis first appeared in his notes.  The only substantial discussion of
Forbes's symptoms appeared with Dr. Rung's observation that Forbes "feels she has nothing
to live for and would be better off dead but denies suicidal plans."  Tr. 478, 480.  Dr. Rung
diagnosed Forbes with severe to extreme depression based on Forbes's rank as a 91 on the
Sheehan Disability Scale and increased her Cymbalta dosage.  Tr. 480.

Forbes argues that the ALJ ignored her consistent reports of depression in the
medical record, but the record has few reports by Forbes about symptoms of depression and
no such complaint to Dr. Ward.  Although Forbes states in her Function Report that "I sit
and cry, feeling depressed at not being able to do more" (Tr. 198), her hearing testimony
and her mother's Third Party Function Report (Tr. 185-92) do not mention depression.

Based on substantial evidence in the record, Forbes's depression is a product of her
chronic pain and not a contributing factor to her inability to work.  An impairment or
combination of impairments is not severe if it does not significantly limit the claimant's
physical or mental ability to do basic work activities.  20 CFR § 404.1521(a).  Both
Dr. Ward (Tr. 350) and Dr. Rung (Tr. 480) characterized Forbes's depression as related to

her chronic pain.  The long absence of complaints until recent treatment with Dr. Rung

when her pain medication seemed ineffective supports that correlation.  Moreover,

Cymbalta is used to treat both depression and fibromyalgia.  MEDLINEPLUS,

http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (Cymbalta is the brand

name for the generic drug, Duloxetine).  Although Dr. Ward was not specific about its

purpose, Forbes testified that she took Cymbalta for her fibromyalgia.  Tr. 51.  Most

importantly, Forbes attributed her forgetfulness at work to her pain and medication (Tr. 69)

and explained that she stays in her pajamas some days because of changes in the weather

and increased activity that both aggravate her pain.  Tr. 198.  Neither are side effects of her

depression.

Given the step two standard and evidence that depression did not limit Forbes's

ability to work, the ALJ did not err in finding Forbes's depression to be non-severe.

## IV.    Remand

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th

Cir), *cert. denied*, 531 US 1038 (2000).  The issue turns on the utility of further

proceedings.  A remand for an award of benefits is appropriate when no useful purpose

would be served by further administrative proceedings or when the record has been fully

developed and the evidence is insufficient to support the Commissioner's decision.  *Strauss*

*v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011).  The court may not

award benefits punitively and must conduct a "credit-as-true" analysis to determine if a

claimant is disabled under the Act.  *Id.*

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*. The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell*, 947 F2d at 348. The reviewing court declines to credit testimony when "an outstanding issue" remains. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by discrediting Forbes's testimony and rejecting Dr. Rung's recommendation for an ergonomic sit/stand workstation. If both are credited, no outstanding issue remains in order to make a determination of disability.

According to Forbes, even with the accommodations of an ergonomic workstation and a heating pad, she can no longer work at any job. The ALJ gave no clear or convincing reason to discredit Forbes and the court can discern none. The record contains some inconsistency regarding how Forbes's previous job ended, but there is no dispute that she could no longer perform that job even with accommodations because of her pain and impaired cognition. As explained above, substantial objective evidence reveals that Forbes's pain worsened after her termination, that numerous treatment options have proved ineffective at stabilizing her pain (Tr. 350, 424), and that her medication is no longer effective. Tr. 350, 461. Furthermore, according to the neurosurgeon, surgery is not an option to improve her condition. Tr. 356.

22 - FINDINGS AND RECOMMENDATION

Even if Dr. Rung is fully credited, the record contains a conflicting opinion by Dr. Ward that Forbes could perform the full range of sedentary work without restriction. Tr. 463-67, 470.  However, the ALJ adopted the restrictions outlined by Dr. Rung. Moreover, Dr. Rung's opinion must be given greater weight for several reasons.  First, Dr. Ward contradicted himself by stating first that Forbes could not perform sedentary work (Tr. 422), then later claiming to lack objective medical to explain why Forbes could not do sedentary work.  Tr. 470.  However, the record contains MRIs and medical examinations diagnosing degenerative disc disease and fibromyalgia sufficient to produce the pain and other symptoms alleged.  In fact, Dr. Ward increasingly opined that Forbes's pain was progressing (Tr. 340, 363), that her job exacerbated her pain (Tr. 340), and she could not return to work.  Tr. 329, 423.  In January 2012, Dr. Ward reported that that Forbes's "condition was chronic and painful enough to be a major irritant to affect the work performance."  Tr. 468.  Third, and more importantly, Dr. Ward referred Forbes to Dr. Rung because he lacked "the expertise as a primary physician" to assess her functional capacity.  Tr. 475.

The culmination of objective evidence supporting Forbes's testimony that she cannot work is her vocational rehabilitation attempt as recommended by Dr. Rung.  As predicted by Dr. Rung, Forbes was declared unemployable due to chronic pain and her inability to concentrate.  Tr. 235.  This is consistent with Forbes's testimony that her condition deteriorated after she left her prior job, such that she can no longer work even with accommodations.

The ALJ erred by stopping at step four and not proceeding to step five of the analysis to determine if Forbes could perform any other jobs if provided all of the limitations given

23 - FINDINGS AND RECOMMENDATION

by Dr. Rung.  Had he continued to step five, the record requires a finding that Forbes is

disabled.  Forbes's attorney asked the VE a hypothetical question that included both

Forbes's testimony and Dr. Rung's opinion, including the need for a heating pad and

ergonomic sit-stand workstation, to lie down outside of normal breaks, and to be absent two

days or month.  Tr. 76-78.  Given those limitations, the VE testified that the person would

not be employable.  Tr. 78.  Thus, it is clear from the record that the ALJ would be required

to find Forbes disabled were such evidence credited.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be reversed

and remanded for an award of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if

any, are due Monday, November 17, 2014.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED October 29, 2014.

                                                    s/ Janice M. Stewart
                                           _____
                                           Janice M. Stewart
                                           United States Magistrate Judge

24 - FINDINGS AND RECOMMENDATION